IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| REVENA J. CARROLL, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| SANDERSON FARMS, INC., SANDERSON | § | CIVIL ACTION NO. 4:10-cv-03108 |
| FARMS, INC. (PRODUCTION DIVISION) | § | JURY DEMANDED |
| SANDERSON FARMS, INC. (PROCESSING | § | |
| DIVISION), SANDERSON FARMS, INC. | § | |
| (FOOD DIVISION), individually and d/b/a | § | |
| SANDERSON FARMS, INC., | § | |
| Defendants, | § | |

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Respectfully submitted,

LAW OFFICE OF G. SCOTT FIDDLER, P.C.


/s/ **G. SCOTT FIDDLER**

_____

G. SCOTT FIDDLER
SBOT #06957750
FID #12508
ANDREW W. REED
SBOT #24074935
FID #1140192
9601 Jones Road, Suite 250
Houston, Texas 77065
Tel.:   281-897-0070
Fax:   281-897-0078
scott@fiddlerlaw.com
areed@fiddlerlaw.com

ATTORNEYS FOR PLAINTIFF

# TABLE OF CONTENTS

Table of Authorities ............................................................................................................. iii

I.      Factual Summary ..................................................................................................... 1

II.     Summary of Argument ........................................................................................... 12

III.    Argument ............................................................................................................... 13

        A.      Summary Judgment Should be Denied on
                Carroll's Disability Discrimination and FMLA Claims ........................................ 13

                1.      Carroll has presented a prima facie case of disability discrimination ....... 14

                2.      Carroll has presented a prima facie case of FMLA retaliation ................. 14

                3.      The evidence is disputed as to pretext and/or whether disability or
                        FMLA leave was a motivating factor in Carroll's discharge .................... 15

        B.      Carroll's Other Claims ......................................................................................... 23

IV.     Conclusion ............................................................................................................. 23

Prayer ............................................................................................................................... 23

Certificate of Service .......................................................................................................... 24

# TABLE OF AUTHORITIES

## Cases

*Abrams v. Lightolier, Inc.*,
    50 F.3d 1204, 1214 (3d Cir.1995) ........................................................................ 22

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505 (1986) .................................................................. 16

*Bell v. Conopco, Inc.*,
    186 F.3d 1099 (8th Cir. 1999) .............................................................................. 17

*Bonilla v. Electrolizing, Inc.*,
    607 F.Supp.2d 307 (D.R.I. 2009) ........................................................................ 20

*Bryson v. Regis Corp.*,
    498 F.3d 561 (6th Cir. 2007) ................................................................................ 20

*Chamberlain v. Farmington Sav. Bank*,
    247 F.R.D. 288 (D. Conn. 2007) .......................................................................... 22

*Danville v. Reg'l Lab Corp.*,
    292 F.3d 1246 (10th Cir. 2002) ............................................................................ 15

*Gee v. Principi*,
    289 F.3d 342(5th Cir. 2002) ................................................................................. 19

*Hodgens v. Gen. Dynamics Corp.*,
    144 F.3d 151 (1st Cir. 1998) ........................................................................... 20, 21

*Laxton v. Gap, Inc.*,
    333 F.3d 572 (5th Cir. 2003) ................................................................................ 19

*Machinchick v. PB Power, Inc.*,
    398 F.3d 345 (5th Cir. 2005) ................................................................................ 17

*Marshall v. Am. Hosp. Ass'n*,
    157 F.3d 520, 526 (7th Cir. 1998) ........................................................................ 21

*Pinkerton v. Spellings*,
    529 F.3d 513 (5th Cir. 2008) ................................................................................ 13

*Price v. Fed. Express Corp.*,
    283 F.3d 715 (5th Cir. 2002) ................................................................................ 15

*Quantum Chem. Corp. v. Toennies,*
   47 S.W.3d 473 (Tex. 2001) ...................................................................13

*Reeves v. Sanderson Plumbing Prods, Inc.,*
   530 U.S. 133 (2000)..............................................................................19

*Richardson v. Monitronics Intern., Inc.,*
   434 F.3d 327 (5th Cir. 2005) ................................................................13

*Robinson v. Shell Oil Co.,*
   519 U.S. 337, 117 S. Ct. 843 (1997) .....................................................22

*Shackelford v. Deloitte & Touche, LLP,*
   190 F.3d 398 (5th Cir. 1999) ................................................................19

*Smith v. Xerox Corp.,*
   602 F.3d 320 (5th Cir. 2010) ..........................................................13, 22

*Stalter v. Wal-Mart Stores, Inc.,*
   195 F.3d 285 (7th Cir. 1999) ................................................................15

*St. Mary's Honor Ctr. v. Hicks,*
   509 U.S. 502, 113 S. Ct. 2742 (1993)...................................................14

*Troupe v. May Dept. Stores Co.,*
   20 F.3d 734 (7th Cir. 1994).................................................................22

*U.S. Postal Serv. Bd. of Governors v. Aikens,*
   460 U.S. 711, 103 S. Ct. 1478 (1983)...................................................15

*Walther v. Lone Star Gas Co.,*
   952 F.2d 119 (5th Cir. 1992) ................................................................15

*Young-Losee v. Graphic Packaging Intern., Inc.,*
   631 F.3d 909 (8th Cir. 2011) ................................................................20

## STATUTES

TEX. LAB. CODE § 21.125 ...................................................................13

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

REVENA J. CARROLL,                      §
     Plaintiff,                         §
                                        §
vs.                                     §
                                        §
SANDERSON FARMS, INC., SANDERSON        §          CIVIL ACTION NO. 4:10-cv-03108
FARMS, INC. (PRODUCTION DIVISION)       §                  JURY DEMANDED
SANDERSON FARMS, INC. (PROCESSING       §
DIVISION), SANDERSON FARMS, INC.        §
(FOOD DIVISION), individually and d/b/a §
SANDERSON FARMS, INC.,                  §
     Defendants.                        §

---

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiff, Revena J. Carroll ("Carroll") files this *Plaintiff's Response to Defendants' Motion for Summary Judgment*, and would respectfully show the following:

## I.    FACTUAL SUMMARY

Sanderson Farms[1] operates a poultry processing plant in Waco, Texas. Before coming to Sanderson Farms, Carroll had an extended and successful career in human resources. From May 1999 until June 2002, Carroll served as the Human Resource, Safety and Environmental Manager at Lamson & Sessions, a manufacturing plant. Carroll resigned from Lamson & Sessions because the plant was shutting down. Carroll then worked at Tracer Construction Company ("Tracer"), a division of Tyco Thermal Controls, as a Human Resources Generalist from approximately June 2002 until June 2005. Carroll left Tracer because she had moved and

---

[1] Sanderson Farms, Inc., Sanderson Farms, Inc. (Production Division), Sanderson Farms, Inc. (Processing Division), Sanderson Farms, Inc. (Food Division), individually and d/b/a Sanderson Farms, Inc. are collectively referred to herein as "Defendants" or "Sanderson Farms."

her commute was over 100 miles each way. After Tracer, Carroll worked at Russell Stover Candies from approximately June 2005 until October 2006 as the Plant Human Resources Safety Manager. Carroll resigned from Russell Stover Candies to become the Plant HR Manager at Armour-Eckrich Meats, where she worked from October 2006 until February 2008. Carroll left Russell Stover Candies because the Armour-Eckrich Meats plant was closer to her home and provided better pay. Carroll's employment with Armour-Eckrich Meats ended in February 2008 when the plant closed.[2]

Other than the closing of Armour-Eckrich Meats, Carroll had never been terminated from any job prior to Sanderson Farms. The positions Carroll held at Lamson & Sessions, Russell Stover Candies and Armour-Eckrich Meats were the highest ranking in human resources at each of those plants.[3]

Carroll began working for Sanderson Farms in Waco, Texas, as the Field Employees Relations Manager ("FERM") on April 1, 2008.[4] As the FERM for the Sanderson Farms processing plant in Waco, Carroll was the highest ranking human resources representative in the facility and had approximately fifteen employees reporting to her.[5] Carroll reported directly to Todd Ormon ("Ormon"), the Division Manager.[6] Carroll's job duties as the FERM included administering discipline to the hourly employees. This included discipline such as written reprimands and placing employees on final warning. The discipline would be communicated to the employee in Carroll's office.[7] Carroll had authority to terminate hourly employees.[8]

---

[2] Exhibit 1, Carroll Dec., ¶ 3; Exhibit 2, Carroll Dep., pp. 66-73.
[3] Exhibit 1, Carroll Dec., ¶ 3; Exhibit 2, Carroll Dep., pp. 66-73.
[4] Exhibit 1, Carroll Dec., ¶ 2; Exhibit 2, Carroll Dep., p. 101.
[5] Exhibit 2, Carroll Dep., pp. 103; Exhibit 1, Carroll Dec., ¶ 4.
[6] Exhibit 2, Carroll Dep., p. 104; Exhibit 1, Carroll Dec., ¶ 4.
[7] Exhibit 2, Carroll Dep., pp. 108-09; Exhibit 1, Carroll Dec., ¶ 4.
[8] Exhibit 2, Carroll Dep., p. 110; Exhibit 1, Carroll Dec., ¶ 4.

Sanderson Farms has a practice of progressive discipline with regard to its salaried employees.[9] Progressive discipline is the practice of progressively providing more severe warnings or discipline in response to poor performance or misconduct prior to termination to give the employee notice of any alleged performance deficiency and to provide the opportunity to improve.[10]

On June 25, 2008, Carroll applied for the FERM position at the Brazos Production plant because it was closer to her home. At that point, Carroll had worked under Ormon for approximately three months. The application required Ormon's approval before Carroll would be permitted to apply.[11] Supervisors are only supposed to sign off on the application if the subordinate is performing well. Ormon gave his approval, but Doug Lee ("Lee"), Ormon's supervisor, was unwilling to let go of Carroll at that time and so informed the hiring manager at the Brazos Production plant.[12]

Carroll was a strong performer and she repeatedly received compliments from corporate level managers about her strong performance. One such manager spoke highly of Carroll so much that Ormon and Ross Harbison ("Harbison") (Plant Manager) joked that the manager had a crush on Carroll.[13] The compliments were well-deserved. For example, Carroll was responsible for managing workers' compensation claims. Because of her aggressive case management, in 2008 she succeeded in bringing the cost of workers' compensation claims down 68% from the previous year.[14]

---

[9] Exhibit 1, Carroll Dec., ¶ 5.
[10] Exhibit 3, Ormon Dep., p. 27; Exhibit 1, Carroll Dec., ¶ 5.
[11] Exhibit 3, Ormon Dep., pp. 122-23, Ormon Dep. Exh. 19.
[12] Exhibit 1, Carroll Dec., ¶ 6.
[13] Exhibit 1, Carroll Dec., ¶ 7.
[14] Exhibit 1, Carroll Dec., ¶ 7; Exhibit 4, Paris Dec., ¶ 2.

-3-

Carroll's first (and only) performance review was conducted on January 2, 2009. The review was conducted by Ormon and covered Carroll's performance for 2008. Carroll received a "Satisfactory" rating, which was generally the highest score employees received.[15] Ormon told Carroll she was doing a great job and he was happy with her performance. In the written performance review, Ormon did not indicate there was any way in which Carroll was not performing as expected. Carroll also received a nine percent raise, five percent (prorated from her April 2008 start date) of which was a merit pay increase as a result of this performance review. A five percent raise was high on the range of potential raises for which Carroll was eligible at the time.[16]

In approximately February 2009, Ormon spoke with Carroll about complaints made by six hourly employees in the context of training sessions in January 2009. Ormon told Carroll to pull the files on the employees who had complained. As it turned out, each employee had been recently written up or suspended by Carroll. When Ormon looked at the files, he told Carroll, "Don't worry about it," as did Sanderson Farms's Training Manager. The complaints were unjustified. Such complaints are part of being in human resources and being the one who administers discipline to employees, and was likely a result of Carroll's predecessor's failure to enforce company policies.[17] Further, the complaints were not directed only to Carroll:

---

[15] Exhibit 2, Carroll Dep., pp. 120-21; Exhibit 3, Ormon Dep., pp. 44-45, Ormon Dep. Exh. 7; Exhibit 1, Carroll Dec, ¶ 8. Indeed, Ormon, who had risen from earning $20,000 annually at a processing plant in Mississippi to the top manager over 1000 employees earning approximately $300,000 annually, consistently received "Satisfactory" ratings in a twelve-year period of time, along with continued promotions and raises. Exhibit 3, Ormon Dep., pp. 50-51; Exhibit 1, Carroll Dec., ¶ 8.
[16] Exhibit 3, Ormon Dep., p. 46; Exhibit 2, Carroll Dep., p. 121; Exhibit 1, Carroll Dec., ¶ 8.
[17] Exhibit 1, Carroll Dec., ¶ 9. Carroll's predecessor had been lax in administering fair and consistent disciplinary action and policies and procedures. In fact, Stacy Webb, the Training Manager who reported to Robin Robinson, told Carroll not to worry about the complaints because they were a result of the change in regime and because Carroll was carrying out policies and procedures which were previously unenforced. *Id.*

-4-

- "Place your attention on the secretaries (personnel Clerks) because they are rude and train them so they learn how to treat people. – Maria Martinez"

- "One of my suggestions is to better train the office personnel so they treat and inform employees better . . . ."

- "I don't like the way the Personnel Clerk, names Mariska, treats people. – Maria Garcia"

- "I don't agree with the way they treat us in the Nurses Station."

- "The personnel clerks don't tend people the way they should. – Yomaria Llanas"

- "You need to check more for the many lazy bums in different areas of the company. – Mario Nuñez"[18]

Neither Ormon, nor anyone else, mentioned any other complaints against Carroll after February 2009, or even counseled or reprimanded her on any such issue. Carroll even began asking Harbison or the employees' supervisor to sit in on disciplinary action meetings and tell her if she was rude. After each meeting, Carroll would ask Harbison (or the employee's supervisor) if she had been rude. The answer was always in the negative.[19] Defendants have not produced a single e-mail, document, or handwritten note that indicates any person at Sanderson Farms ever mentioned employee complaints after February 2009 to Carroll.

While working as the FERM, Carroll became concerned Sanderson Farms was targeting people who had been on FMLA leave. For example, when one employee was on intermittent FMLA leave, Ormon said to Carroll, "Can't we just fire her yet? She's gone more than she's here."[20] Lee was Ormon's boss. In 2009, Lee instructed Rebecca Morgan (Brazos Processing Plant FERM) to "terminate the guy that had just filed the FMLA claim."[21]

---

[18] Document 28-7 (Exhibit G, Bates-numbered document CBS 00629). "Document [#]" shall refer to number of the document filed in this case.
[19] Exhibit 1, Carroll Dec., ¶ 9.
[20] Exhibit 2, Carroll Dep., p. 190-91; Exhibit 1, Carroll Dec., ¶ 10.
[21] Exhibit 2, Carroll Dep., p. 198; Exhibit 1, Carroll Dec., ¶ 10.

On top of this, there were numerous terminations and disciplinary actions to which Carroll objected because they were unjustified and directed against employees who were on FMLA leave or out for medical reasons. Others in management at Sanderson Farms agreed with Carroll that the discipline and terminations were retaliatory.[22]

By mid-May of 2009, Carroll was still commuting almost 100 miles one way to work. Carroll began looking for a small home in Mexia, Texas, which was closer to Waco. In approximately mid-May 2009, Carroll spoke with Ormon about a relocation allowance. Even though the policy at the company was to only grant relocation allowances to new hires, Ormon told Carroll when she found a house to let him know and he would try to persuade Lee to approve it. When Carroll found a potential home in Mexia, she asked Ormon if everything was okay regarding the housing allowance. Ormon then told Carroll, "I hope you stay here and retire from Sanderson Farms."[23]

In mid-June 2009, Ormon told Carroll she would be going to the corporate office in Laurel, Mississippi, to receive some training from Robin Robinson ("Robinson"), Director of Organizational Development, who oversaw the training development for Sanderson Farms. Carroll asked Ormon if there was a problem. Ormon said, "No," and that Carroll should not worry about it because "all the managers went through it [the training]." Ormon said nothing about any complaints from employees or any performance issues.[24] Similarly, Robinson did not say there were performance issues or complaints from employees that were the reason for the training. No one ever even suggested to Carroll the training was any form of discipline or the result of any complaints from employees.[25]

---

[22] Exhibit 1, Carroll Dec., ¶ 10.
[23] Exhibit 1, Carroll Dec., ¶ 11.
[24] Exhibit 3, Ormon Dep., pp. 133, Ormon Dep. Exhibit 23; Exhibit 1, Carroll Dec., ¶ 12.
[25] Exhibit 1, Carroll Dec., ¶ 12; Exhibit 6, Robinson Dep. Exh. 4; Carroll Dep., p. 136.

On July 20, 2009, Robinson cancelled the training scheduled for Carroll because of her (Robinson's) health issues. At the time Ormon had no intention to terminate Carroll.[26]

On July 28, 2009, Carroll went on FMLA leave for knee surgery. Carroll had reinjured her knee a few weeks earlier and went to her doctor who told her she needed surgery. Carroll notified Ormon the week before she would be taking FMLA leave. Carroll's doctor faxed a medical certification to Sanderson Farms stating she would need to be off work for six to eight weeks to recover from the surgery. Though she did not see the certification initially, Carroll called Jackie Allen ("Allen"), HR Supervisor, and asked Allen if she had received it. Allen said, "Have you seen this? Your doctor has you off for six to eight weeks. When Todd [Ormon] sees this he's gonna have a shit fit!" Carroll was concerned too, because she was well aware of the attitudes of Ormon and Lee toward people who were on FMLA leave and she did not want to lose her job. So, Carroll asked Allen to hold the paperwork. Carroll then called her doctor and persuaded him to shorten her return to two weeks, at which time she could return on a light duty basis. Carroll's FMLA paperwork was completed, and her leave was approved by Sanderson Farms.[27]

Ormon had seen Carroll limping around the office and using crutches before she went on FMLA leave.[28] Ormon recognized Carroll was impaired in her ability to walk as compared with the average individual.[29] When Carroll went on FMLA leave, Ormon met with the employees

---

[26] *See* Exhibit 3, Ormon Dep., p. 133. As of July 20, 2009, even under Defendants' version of the facts, the intent was to provide training to Carroll—not to terminate her.

[27] Exhibit 2, Carroll Dep., p. 142; Exhibit 1, Carroll Dec., ¶ 14. Carroll was first diagnosed in 2003 with a torn medial meniscus, resulting in a buildup of scar tissue. As a result, she is unable to stand for long periods of time and her knee tries to hyperextend backwards in a locked position. Carroll has had surgery and still suffers from pain and other problems with the knee that affect her ability to walk and stand. She can no longer run and engage in other physical activating involving mobility. Exhibit 2, Carroll Dep., pp. 78-88; Exhibit 1, Carroll Dec., ¶ 15.

[28] Exhibit 3, Ormon Dep., pp. 82-84.

[29] Exhibit 3, Ormon Dep., p. 84.

that reported directly to Carroll and informed them she would be out and they should continue with the normal day-to-day operations of the department. In the meeting, none of the employees made any complaints about Carroll to Ormon.[30]

Carroll returned to work on August 12, 2009, a Wednesday.[31] When Carroll returned, she was still limping.[32] Carroll's leg swelled up horribly, was warm to the touch and caused her considerable pain. She tried to keep her leg elevated at work as the doctor had recommended but the swelling and pain did not subside.[33]

On Monday, August 17, 2009, Carroll's fourth day back after FMLA leave, Carroll found falsified holiday time records for the accounting department on her desk. Lee Ann Wilson ("Wilson") signed off on the records.[34] Carroll took the records to Harbison for signature and told him what she had witnessed. Harbison rightly refused to sign the records. Harbison then apparently went to Ormon's office because Harbison came back to Carroll's office and said Ormon wanted to speak with her. Harbison had to help Carroll walk to Ormon's office because she was having difficulty walking. Wilson then arrived in Ormon's office as well.[35]

In the meeting, Ormon told Wilson and Carroll they needed to work out their differences or they would no longer be employed. Carroll was shocked. Carroll did not have any difficulties with Wilson and Ormon knew it was Wilson who had failed to follow company policy and Texas

---

[30] Exhibit 3, Ormon Dep., pp. 87-88.
[31] Exhibit 2, Carroll Dep., pp. 142-43.
[32] Exhibit 3, Ormon Dep., p. 88.
[33] Exhibit 1, Carroll Dec., ¶ 16.
[34] Exhibit 1, Carroll Dec., ¶ 17. Wilson was Sanderson Farms's in-house accountant in Waco. Wilson routinely failed to comply with Sanderson Farms's policies and procedures. For example, she repeatedly failed to provide checks to terminated employees within six days of termination as required by Texas law and did not keep proper time records. She also yelled at employees, causing one temporary employee to quit on the spot. Carroll attempted to speak with Wilson, but it did not do any good. So, Carroll spoke with Ormon about Wilson and requested that he speak with Wilson. Ormon never did. Ormon was Wilson's direct supervisor. *Id.*; Exhibit 1, Carroll Dec., ¶ 13; Exhibit 2, Carroll Dep., pp. 147-56. Apparently, Wilson had complained that Carroll's office door was shut often, which is true because of HIPPA, FMLA and other confidentiality issues. Exhibit 2, Carroll Dep., pp. 153-54.
[35] Exhibit 1, Carroll Dec., ¶ 17.

law. Carroll had followed Sanderson Farms's policies and procedures and had not done anything wrong, yet Ormon used the opportunity to falsely accuse Carroll of not getting along with Wilson and reprimand Carroll. After the meeting, Carroll met with Ormon. Carroll told Ormon she thought he had been unfair with her because she had followed policy and had previously asked him to take action as to Wilson. Ormon just said, "We are not going to talk about this anymore." [36]

Although Ormon has had to admit the alleged issue with Wilson was not a reason for Carroll's termination,[37] Carroll became concerned Ormon was looking for a reason to terminate her because she had taken FMLA leave.[38] Carroll had seen Sanderson Farms look for reasons to terminate other employees who had taken FMLA leave and became concerned she now had a target on her back.[39] Her fears were soon shown to be justified.

Because of the continued swelling and pain in her leg, Carroll could barely drive herself home after work on August 17, 2009. She tried hot and cold presses to reduce the swelling but her leg did not get better. The pain and swelling were so bad Carroll could hardly sleep that night and when morning came, she realized there was no way she could go to work. So, on the morning of August 18, 2009, Carroll called Ormon on his cell phone and told him she would call her doctor as soon as his office opened at 9:00 a.m. When she was able to speak to him, Carroll's doctor told her he wanted to take her off work for three weeks. Carroll told her doctor she was afraid of losing her job if she was off work too long. Carroll's doctor relented and took Carroll off work for only one week.[40]

---

[36] Exhibit 2, Carroll Dep., pp. 157-58; Exhibit 1, Carroll Dec., ¶ 17.
[37] Exhibit 3, Ormon Dep., pp. 61-62, 72-73.
[38] Exhibit 1, Carroll Dec., ¶ 17.
[39] Exhibit 1, Carroll Dec., ¶ 10.
[40] Exhibit 2, Carroll Dep., ¶ 19.

On the same day, August 18, 2009, Carroll's doctor's office faxed documentation to Sanderson Farms setting forth the medical basis for extending Carroll's FMLA leave.[41] Upon receiving the documentation, Ormon angrily threw the papers at Anniesa Paris ("Paris"), a human resources employee, and said, "I don't need this. I'll take care of it myself!"[42] Paris then called Carroll and said of Ormon, "Man he is pissed!"[43]

When Carroll learned Ormon was angry with her for taking FMLA leave, she called him and explained why she needed to be away from work for one more week. Ormon was angry and short with Carroll. Carroll started to explain to Ormon what the doctor had told her. Ormon angrily cut her off, and said, "Just do whatever you need to do!" Ormon then hung up on Carroll without even saying goodbye.[44]

Carroll was out the remainder of the week on FMLA leave recuperating from her surgery.[45]

The following Monday, August 24, 2009, Carroll returned to work. Around lunchtime, Ormon walked into Carroll's office, and said, "We've decided to make some changes." Ormon then pulled a check from his pocket, and said, "This covers your pay through the end of the month" and started to explain about the check.[46]

Carroll looked at Ormon stunned, and said, "You're kidding, right?" Ormon offered no further explanation as to the alleged reasons for Carroll's termination. Ormon never mentioned anything about complaints from employees and offered no other reason for termination.[47] In fact, there was not a shred of paper in Carroll's personnel file indicating any disciplinary action

---

[41] Exhibit 2, Carroll Dep., p. 146; Exhibit 3, Ormon Dep., p. 91-92; Exhibit 1, Carroll Dec., ¶ 20.
[42] Exhibit 4, Paris Dec., ¶ 3; Exhibit 2, Carroll Dep., pp. 179-80; Exhibit 1, Carroll Dec., ¶ 20.
[43] Exhibit 1, Carroll Dec., ¶ 20.
[44] Exhibit 2, Carroll Dep., pp. 146-47; Exhibit 1, Carroll Dec., ¶ 21.
[45] Exhibit 1, Carroll Dec., ¶ 21.
[46] Exhibit 2, Carroll Dep., pp. 161-163; Exhibit 1, Carroll Dec., ¶ 22.
[47] Exhibit 2, Carroll Dep., pp. 161-163; Exhibit 1, Carroll Dec., ¶ 22.

against her, threatening her with termination, or that her performance was anything less than what was expected of her.[48] Contrary to company practice, Ormon had not even consulted with the corporate Human Resources department at Sanderson Farms before making his decision.[49]

The same day of Carroll's termination, Allen, an HR employee at the Waco plant of Sanderson Farms, called Carroll from work and asked Carroll what reason Ormon had given her for her termination. When Carroll told her, Allen said, "That's bullshit!"[50]

After being terminated from Sanderson Farms—the first time she had ever been fired from any job[51]—Carroll applied for a human resources specialist position at the City of Houston. On the third interview, the person who would have been Carroll's direct report told Carroll she was completely satisfied and was ready to hire her. However, when the City of Houston attempted to contact Sanderson Farms to verify Carroll's employment, Ormon would not respond. Carroll never got the job at the City of Houston.[52]

Carroll was earning $67,000 annually at the time of her termination.[53] She had accumulated six head of cattle and five calves, as well as donkeys and horses, over the years toward her dream of retiring some day to a ranch. As soon as she reached her car after being terminated, Carroll got on the phone to start making arrangements to sell her livestock because she no longer had a job and could not afford them. Following her termination, Carroll was barely able to make payments on her utilities and her house, for which she was forced to have her

---

[48] Exhibit 2, Carroll Dep., pp. 174-75.
[49] Exhibit 3, Ormon Dep., pp. 99-100; Exhibit 2, Carroll Dep., pp. 166-67. Allen was not the only Sanderson Farms employee in human resources who was surprised. Brenda Gatlin in Corporate Human Resources told Carroll later, " . . . we were so shocked when we found out about your termination." Exhibit 1, Carroll Dec., ¶ 23.
[50] Exhibit 2, Carroll Dep., pp. 25-27; Exhibit 1, Carroll Dec., ¶ 24.
[51] The only other involuntary separation was the result of a plant closing, not any allegations of poor performance or misconduct. Exhibit 1, Carroll Dec., ¶ 3.
[52] Exhibit 2, Carroll Dep., pp. 58-62.
[53] Exhibit 2, Carroll Dep., p. 39; Exhibit 2, Carroll Dec., ¶ 25.

parents co-sign. In addition, Carroll had no choice but to return her new Hyundai Genesis and has fallen behind on her credit cards.[54] She has since struggled with depression, loss of sleep, anxiety and uncontrollable crying spells.[55]

## II. SUMMARY OF ARGUMENT

Carroll has presented a prima facie case of both disability discrimination and FMLA retaliation. Further, a genuine issue of material fact exists as to whether the stated reason for discharge is the real reason or a pretext for disability discrimination or FMLA retaliation.

Sanderson Farms has, after-the-fact, added to their reason for discharging Carroll, and has significantly overstated the nature and number of complaints allegedly made against Carroll. Neither Ormon nor anyone else at Sanderson Farms counseled Carroll about or mentioned complaints from hourly employees after February 2009.

Sanderson Farms's explanation as to why they terminated Carroll the day she returned from FMLA leave on August 24, 2009, is not credible because Ormon admits he could not have known whether the alleged complaints were concerning Carroll's conduct before or after he says he counseled Carroll. Also, Sanderson Farms's termination of Carroll the same day she returned from FMLA leave suggests retaliation and discrimination, and there is no documentation to support Sanderson Farms's contention Carroll was terminated because of employee complaints.

Ormon's angry outburst upon receiving Carroll's FMLA papers and his angry outburst toward Carroll and hanging up on her when she told him she needed to go back on FMLA leave are evidence of a discriminatory motive. Moreover, Ormon did not consult with the corporate Human Resources department at Sanderson Farms before making the decision to terminate Carroll, and Ormon's attitude toward Carroll changed when she returned from FMLA leave.

---

[54] Exhibit 2, Carroll Dep., pp. 163-64; Exhibit 1, Carroll Dec., ¶ 25.
[55] Exhibit 2, Carroll Dep., pp. 186-87; Exhibit 1, Carroll Dec., ¶ 25.

The statements made by those in the chain of authority at Sanderson Farms about employees who had medical problems or had taken FMLA leave are evidence of a discriminatory motive, as is Sanderson Farms's pattern and practice of terminating other employees who had medical problems and/or were on FMLA leave.

Lastly, Ormon's post-termination conduct in refusing to respond to calls from the City of Houston, effectively preventing Carroll from finding a job, is evidence of a retaliatory motive.

Carroll does not oppose dismissal of her defamation claim, but she does oppose dismissal as to her other claims on which Defendants have not moved for summary judgment.

## III. ARGUMENT

### A. Summary Judgment Should be Denied on Carroll's Disability Discrimination and FMLA Claims

Defendants do not dispute Carroll's ability to present a prima facie case of disability discrimination under the American's With Disabilities Act ("ADA") and the Texas Commission on Human Rights Act ("TCHRA"). Defendants do not dispute that Carroll can present a prima facie case of FMLA discrimination.

Instead, Defendants claim Carroll cannot present evidence of pretext. It should be noted though that under the FMLA,[56] ADA[57] and TCHRA,[58] Carroll only need present evidence that FMLA leave/disability was a motivating factor in the adverse employment action, even if other factors motivated the decision. Consequently, there is no need to show that the reason offered for discharge is a pretext because a legitimate reason can exist with an illegitimate reason and the decision would still be illegal.[59]

---

[56] *Richardson v. Monitronics Intern., Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).
[57] *Pinkerton v. Spellings*, 529 F.3d 513, 518 (5th Cir. 2008).
[58] TEX. LAB. CODE § 21.125; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 479 (Tex. 2001).
[59] *See Smith v. Xerox Corp.*, 602 F.3d 320, 326 (5th Cir. 2010).

Nevertheless, the evidence presented by Carroll shows a genuine issue of material fact exists as to whether the reason offered for discharge is pretext and/or that disability/FMLA leave was a motivating factor in the reason for discharge.

**1.      Carroll has presented a prima facie case of disability discrimination**

Defendants to do not dispute Carroll can present a prima facie case of disability discrimination. First, Carroll suffered from a disability or was perceived as having a disability.[60] Second, Carroll was qualified for her job.[61] Third, Carroll was terminated. Fourth, Carroll was replaced by an employee who was not disabled.[62] The prima facie case creates an inference that the termination was because of disability,[63] and the burden shifts to Defendants to offer a legitimate non-discriminatory reason for discharge.

**2.      Carroll has presented a prima facie case of FMLA retaliation**

Defendants do not dispute Carroll can present a prima facie case of FMLA retaliation. First, Carroll was protected under the FMLA.[64] Second, Carroll was terminated. Third, Carroll has presented evidence of a causal link between the two, namely that she was fired the day she returned from FMLA leave.[65] The prima facie case creates an inference Defendants terminated Carroll because she exercised her rights under the FMLA,[66] and the burden shifts to the Defendants to offer a legitimate non-discriminatory reason for discharge.

---

[60] Exhibit 3, Ormon Dep., p. 84; Exhibit 2, Carroll Dep., pp. 78-88; Exhibit 1, Carroll Dec., ¶¶ 14, 15.
[61] Exhibit 3, Ormon Dep., pp. 41-42.
[62] Document 28, p. 18.
[63] *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506, 113 S. Ct. 2742 (1993).
[64] Carroll Dec., ¶ 14; Document 10, p. 3.
[65] Exhibit 1, Carroll Dec., ¶ 22.
[66] *Hicks*, 509 U.S. at 506.

**3.    The evidence is disputed as to pretext and/or whether disability or FMLA leave was a motivating factor in Carroll's discharge**

Defendants engage in a fallacious divide and conquer argument. They take each piece of evidence of pretext they anticipate Carroll will offer, examine it in isolation, find a case that suggests that piece of evidence alone does not show pretext and then argue they are entitled to judgment as a matter of law. In a circumstantial evidence case, all the evidence must be examined, *as a whole*, to determine whether there is evidence the reason offered for discharge is not credible.[67] Consequently, it is improper for Defendants to argue that this piece of evidence or that piece of evidence alone does not show pretext.[68] The evidence here, whether considered in whole or in part, demonstrates the existence of a genuine factual dispute over the intent behind the decision to terminate Carroll.

First, it should be noted Defendants have, after-the-fact, added to their reason for discharging Carroll, now stating complaints received against Carroll including those during a union organizing effort was the reason for her discharge.[69] Defendants never mentioned anything about a union organizing effort to the Equal Employment Opportunity Commission ("EEOC") in response to Carroll's EEOC charge[70] or in response to Carroll's interrogatories.[71] When an employer attempts to add to the reasons for discharge after-the-fact, it is evidence of pretext.[72]

---

[67] *See Price v. Fed. Express Corp.*, 283 F.3d 715, 721 n. 4 (5th Cir. 2002); *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1250 (10th Cir. 2002) ("When assessing whether plaintiff has made an appropriate showing of pretext, we must consider the evidence as a whole."); *Washington v. Davis*, 426 U.S. 229, 2442 (1976) ("Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts . . .").

[68] *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S. Ct. 1478 (1983) ("The trier of fact should consider all the evidence, giving it whatever weight and credence it deserves").

[69] Document 28, p. 19.

[70] *See* Exhibit 7.

[71] Exhibit 8.

[72] *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 124 (5th Cir. 1992) (finding, based on a defendant's inability to point to evidence in a personnel file indicating performance dissatisfaction, a jury could reasonably infer that the defendant's explanation was "an after-the-fact inspiration triggered by the necessity of fending off litigation."); *see also Stalter v. Wal-Mart Stores, Inc.*, 195 F.3d 285, 291 (7th Cir. 1999).

Second, Defendants have significantly overstated the nature and number of complaints allegedly made against Carroll. Defendants provide a list of complaints, but only a few refer specifically to Carroll by name or title ("FERM").[73] There were sixteen people who worked in the human resources department in Waco at the time.[74] To conclude that all the complaints were against Carroll would be to draw an inference in favor of the summary judgment movant, which is improper on summary judgment and to be left for a jury.[75] Indeed, the evaluation forms from training sessions on which Defendants rely show only ten complaints that identify Carroll by name or title. These complaints come from a workforce of more than one thousand employees[76] and from numerous training sessions over a seven-month period prior to Carroll taking FMLA leave.[77] This is hardly to be unexpected when Carroll is the employee saddled with administering discipline to these employees. Indeed, of those ten complaints, six were allegedly made in the January 2009 training by employees Carroll had disciplined. Ormon apparently suspected as much and instructed Carroll to pull those employees' personnel files to check. When Ormon saw this was the case, he told Carroll not to worry about it and never mentioned employee complaints to her again. The Training Manager also told Carroll not to worry about it and attributed the complaints to the lax discipline of Carroll's predecessor who failed to insist on compliance with company policies.[78] It is only after Carroll took FMLA leave that Defendants now claim the complaints were justified or a need for concern.

---

[73] Document 28, pp. 6-9; Document 28-7 (Exhibit G).

[74] Exhibit 1, Carroll Dec., ¶ 4.

[75] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[76] Exhibit 3, Ormon Dep., pp. 33, 35-36.

[77] Document 28-7 (Exhibit G). The remarks regarding Carroll from the August 19th and 20th meetings are discussed on pages 18-19 herein.

[78] Exhibit 1, Carroll Dec., ¶ 9.

Third, neither Ormon nor anyone else at Sanderson Farms counseled Carroll about complaints from hourly employees after Ormon dismissed the complaints from disgruntled employees against her in February 2009.[79] It was the practice of Sanderson Farms to provide progressive discipline to its salaried employees.[80] In fact, Ormon had enjoyed the benefits of progressive discipline by receiving multiple warnings, both oral and verbal, and teetering on the edge of termination before improving his performance.[81] Progressive discipline is the practice of providing progressively more severe warnings or discipline in response to poor performance or misconduct prior to termination to give the employee notice of any alleged performance deficiency and to provide the opportunity to improve.[82] Here, though, Ormon completely by-passed progressive discipline with regard to Carroll.[83] The failure to comply with a practice or policy of progressive discipline is evidence of pretext.[84] It is evidence of pretext because the failure to provide progressive discipline is consistent with Carroll's contention her performance was not deficient. And, even if a plaintiff's performance is deficient, the failure to afford progressive discipline is evidence the employer did not want to give the plaintiff the opportunity to improve but wanted her terminated for another reason, e.g., a discriminatory one.[85]

---

[79] Exhibit 1, Carroll Dec., ¶ 9.

[80] Exhibit 1, Carroll Dec., ¶ 5; *see also* Exhibit 3, Ormon Dep., p. 27.

[81] Exhibit 3, Ormon Dep., pp. 19-30.

[82] Exhibit 1, Carroll Dec., ¶ 5.

[83] Ormon contends he and Robinson were trying to get Carroll to Laurel, Mississippi, to place her on a "performance improvement plan." However, the e-mails concerning the trip say nothing about a performance improvement plan. Exhibit 3, Ormon Dep., 127-33, Ormon Dep. Exhs. 21-23. Nor can Ormon give an adequate explanation for why Carroll would have to fly to Laurel, Mississippi, to be put on a performance improvement plan. Exhibit 3, Ormon Dep., p. 131. Only "training" is referenced, which is consistent with Carroll's testimony she was told it was for training that all managers received at one time or another. Exhibit 1, Carroll Dec., ¶ 12; Exhibit 2, Carroll Dep., p.133.

[84] *See Machinchick v. PB Power, Inc.*, 398 F.3d 345, 354 n.29 (5th Cir. 2005); *Bell v. Conopco, Inc.*, 186 F.3d 1099, 1102 (8th Cir. 1999)

[85] Of course there are times when the failure to provide progressive discipline makes sense. For example, in the case of gross insubordination or theft. Neither are performance issues. Here, no such allegations were made against Carroll, and even Defendants contend they offered Carroll the opportunity to improve—which Carroll denies.

Fourth, Defendants have to explain why they terminated Carroll the day she returned from FMLA leave on August 24, 2009, because when she went on FMLA leave on August 18, 2009, she was not terminated.[86] Defendants' contention they terminated Carroll because complaints they received on August 19 and 20 indicated Carroll had not improved is not credible. Ormon claims he spoke with Carroll a second time about complaints from employees after a training session, though he cannot remember when and has no written record of the meeting or *any documentation* for that matter that any such meeting took place.[87] There was no such meeting other than the February 2009 meeting discussed above.[88] Nevertheless, even if one accepted Ormon's testimony as true—which would be inappropriate on summary judgment—Ormon's claim that he terminated Carroll for failure to improve in this area still fails. Ormon claims he counseled Carroll after one of the later training meetings, possibly between May 2009 and July 2009. He claims he then heard about complaints from the August 19, 2009 and August 20, 2009 training sessions—which took place while Carroll was on FMLA leave—and that from those complaints he decided Carroll had not improved her performance and so he terminated her.[89] But Ormon admits there is no way he could know whether the complaints in the August 19 or 20 training sessions came from Carroll's conduct before or after he allegedly counseled her.[90] Therefore, Ormon's allegation that Carroll had not improved makes no sense. He could not have known that from the facts he says he relied upon. As stated above, there was no counseling by Ormon with Carroll of a need to improve or regarding further complaints from employees, so in a certain sense this does not matter. What it does show is that even under Ormon's version of the

---

[86] Ormon admits that the issue with Wilson that was discussed on August 17, 2009, was not a reason for Carroll's termination. Exhibit 3, Ormon Dep., pp. 61-62, 72-73.
[87] Exhibit 3, Ormon Dep., pp. 81, 113-14.
[88] Exhibit 1, Carroll Dec., ¶ 9.
[89] Exhibit 3, Ormon Dep., pp. 117-122; *See also* Exhibit 3, Ormon Dep., p. 122 ("I didn't feel like she had done anything to improve the relationship with the employees.").
[90] Exhibit 3, Ormon Dep., pp. 121-22.

facts, his decision is not credible. When facts are presented that cast doubt on the reason offered for discharge, summary judgment on the issue of pretext is improper.[91]

Fifth, the timing of Carroll's termination suggests retaliation and discrimination. As of July 20, 2009, even under Defendants' version of the facts, the intent was to provide training to Carroll—not to terminate her—but Robinson had to cancel because of health issues.[92] Ormon claims the only thing that happened between July 20th and August 24th that led to Carroll's termination was the August 19 and 20 training sessions.[93] That explanation is not credible for the reasons stated above. Of course, there was something else that happened between July 20, 2009, and August 24, 2009—Carroll took FMLA leave twice. She was fired the day she returned from her second FMLA leave.[94] Suspicious timing like this is evidence of a discriminatory motive.[95]

Sixth, there is no documentation to support Defendants' contention Carroll was terminated because of employee complaints. If this really was the reason Carroll was terminated, one would expect at least notes, a memo, or an e-mail between Ormon and Carroll or Robinson that would at least give some support of his thought process. There is nothing. The lack of documentation suggests a different motive, one Ormon would not put in writing and birthed out of anger for Carroll having taking leave.

---

[91] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 145-46 (2000); *Gee v. Principi*, 289 F.3d 342, 348 (5th Cir. 2002); *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).
[92] *See* Exhibit 3, Ormon Dep., p. 133.
[93] Exhibit 3, Ormon Dep., pp. 133-34.
[94] Exhibit 1, Carroll Dec., ¶¶14, 20, 22.
[95] *See Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 409 (5th Cir. 1999) (finding the combination of suspicious timing, along with other evidence of pretext, to be sufficient to deny summary judgment).

Seventh, when Ormon received Carroll's FMLA justification from Carroll's doctor, he threw the papers at Paris, and said, "I don't need this. I'll take care of it myself."[96] As Paris has testified, Ormon was "pissed."[97] When Carroll called Ormon, he was angry with her and hung up on her.[98] Such angry outbursts in response to an employee taking FMLA leave are evidence of a discriminatory motive.[99]

Eighth, Ormon did not consult with human resources before making the decision to terminate Carroll. This was a departure from Sanderson Farms's normal practice with regard to salaried employees.[100] Such departures from policy or practice can be evidence of a discriminatory motive.[101] Human resource departments exist to provide a filter for adverse employment actions and to ensure such actions are justified and not motivated by unlawful intentions. Therefore, when a manager completely by-passes human resources, a judge or jury is right to look at the decision with a more critical eye.

Ninth, Ormon's attitude toward Carroll changed when she returned from FMLA leave on August 12, 2009. Before that, Ormon had given Carroll a good performance review and a merit pay increase, had approved her application for a desired job, and had, as recently as May 2009, told Carroll, "I hope you stay here and retire from Sanderson Farms." Carroll went on FMLA leave on July 28, 2009, and returned on August 12, 2009. Then on August 17, 2009, Ormon

---

[96] Exhibit 4, Paris Dec., ¶ 3; Exhibit 2, Carroll Dep., pp. 179-80; Exhibit 1, Carroll Dec., ¶ 20.

[97] Exhibit 4, Paris Dec., ¶ 3.

[98] Exhibit 2, Carroll Dep., pp. 146-47; Exhibit 1, Carroll Dec., ¶ 21.

[99] *See Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007); *Bonilla v. Electrolizing, Inc.*, 607 F.Supp.2d 307, 323 (D.R.I. 2009) (finding supervisor's anger directed at plaintiff upon taking FMLA leave to be probative of discriminatory animus); *Young-Losee v. Graphic Packaging Intern.*, *Inc.*, 631 F.3d 909, 912 (8th Cir. 2011) (finding direct evidence of retaliation where supervisor crumpled up sexual harassment complaint, threw it in the garbage and told the employee the complaint was "total bulls***" and "I want you out of here.").

[100] Exhibit 1, Carroll Dec., ¶ 23.

[101] *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 168-69 (1st Cir. 1998) ("In assessing discriminatory motive [in an FMLA retaliation action], a court may also consider other factors, including . . . departures from the normal procedural sequence.") (citations omitted).

falsely reprimanded her (along with Wilson), when Ormon knew Carroll had only attempted to get Wilson to comply with Sanderson Farms's policies.[102] When Carroll attempted to talk with Ormon thereafter, he refused to talk to Carroll about it. Such sudden changes in attitude once an employer became aware the employee is a member of a protected class (here FMLA leave and disability) is more than sufficient to raise an inference of discrimination.[103]

Tenth, the statements made by those in the chain of authority at Sanderson Farms about employees who had medical problems or had taken FMLA leave are evidence of a discriminatory motive. While one employee was on intermittent FMLA leave, Ormon said to Carroll, "Can't we just fire her yet? She's gone more than she's here."[104] Lee was Ormon's boss. Lee instructed Rebecca Morgan to "terminate the guy that had just filed the FMLA claim."[105] Such statements are evidence of a discriminatory motive.[106]

Eleventh, Sanderson Farms's pattern and practice of terminating other employees who had medical problems and/or were on FMLA leave is probative of a discriminatory motive. Carroll has identified seven other employees who have been subjected to discriminatory treatment for having taken FMLA or medical leave,[107] not to mention two other employees— Anniesa Paris and Kelly LaBarbera—who have provided declarations, and both of whom took FMLA leave, were terminated and given false reasons for their discharge.[108] Such a pattern and

---

[102] Exhibit 1, Carroll Dec., ¶ 17. Ormon admits this alleged issue with Wilson was not a reason he terminated Carroll. Exhibit 3, Ormon Dep., pp. 61-62, 72-73.

[103] *See Marshall v. Am. Hosp. Ass'n*, 157 F.3d 520, 526 (7th Cir. 1998).

[104] Exhibit 2, Carroll Dep., pp. 190-91.

[105] Exhibit 2, Carroll Dep., p. 198; Exhibit 1, Carroll Dec., ¶ 10.

[106] *Hodgens*, 144 F.3d at 171. ("Statements by supervisors carrying the inference that the supervisor harbored animus against protected classes of people or conduct are clearly probative of pretext.").

[107] Exhibit 1, Carroll Dec., ¶¶ 26-31.

[108] Exhibit 4, Paris Dec., ¶¶ 4, 5; Exhibit 5, LaBarbera Dec., ¶¶ 3-6.

practice of terminating employees on FMLA and medical leave is evidence of a discriminatory motive.[109]

Twelfth, Ormon's post-termination conduct in refusing to respond to calls from the City of Houston, effectively preventing Carroll from finding a job, is evidence of a retaliatory motive. Ormon did not hesitate to approve Carroll's request for a transfer before he found out she had a physical impairment or she took FMLA leave. Post-termination conduct such as this can be evidence of a retaliatory motive.[110]

Taken individually, or as a whole, the evidence demonstrates a genuine issue of material fact on the issue of whether the reason offered for discharge is a pretext and/or whether Carroll's protected class was a motivating factor in the decision to discharge her.

Carroll is not required to show evidence of pretext and additional evidence of discrimination.[111] Consequently, the evidence above which casts doubt on the reason offered for discharge, combined with Carroll's prima facie case of discrimination under the FMLA, ADA and TCHRA, is sufficient to preclude summary judgment.[112]

---

[109] *See Abrams v. Lightolier, Inc.*, 50 F.3d 1204, 1214 (3d Cir.1995) (supervisor's negative attitude toward other employees in protected class was probative of discriminatory intent); *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (recognizing that behavior directed at other employees in the protected group is one of the "most common types" of evidence of discriminatory intent); *Chamberlain v. Farmington Sav. Bank*, 247 F.R.D. 288, 291 (D. Conn. 2007) (stating information regarding an employer's history of discipline and termination of persons exercising rights under the FMLA "may provide evidence to support an inference that the defendant acted with a discriminatory and retaliatory motive in terminating the plaintiff and that its stated reasons for the plaintiff's termination are pretextual.").
[110] *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843 (1997).
[111] *Smith v. Xerox Corp.*, 602 F.3d 320, 326 (5th Cir. 2010).
[112] *Id.*

**B.     Carroll's Other Claims**

Carroll does not oppose dismissal of her defamation claim, but she does oppose dismissal as to her other claims on which Defendants have not moved for summary judgment.[113]

## IV. CONCLUSION

Carroll has presented evidence of a prima facie case of disability discrimination under the ADA and TCHRA.

Carroll has presented evidence of a prima facie case of FMLA discrimination.

Carroll has presented more than sufficient evidence that the reason offered for discharge is a pretext under the ADA, TCHRA and FMLA and/or that her disability/FMLA leave was a motivating factor in her discharge.

Carroll does not oppose dismissal of her defamation claim, but she does oppose dismissal as to her other claims on which Defendants have not moved for summary judgment.

## PRAYER

WHEREFORE, Revena J. Carroll requests that Defendants' motion for summary judgment be denied and that she receive such other and further relief, whether general or special, legal or equitable, to which she may be justly entitled.

---

[113] Carroll has alleged Defendants retaliated against her under the FMLA by interfering in her attempt to find work. *See* Document 3, ¶¶ 18, 20. Defendants have not moved for summary judgment on this claim.

Respectfully submitted,

LAW OFFICE OF G. SCOTT FIDDLER, P.C.

/s/ **G. SCOTT FIDDLER**

_____

G. SCOTT FIDDLER
SBOT #06957750
FID #12508
ANDREW W. REED
SBOT #24074935
FID #1140192
9601 Jones Road, Suite 250
Houston, Texas 77065
Tel.:    281-897-0070
Fax:    281-897-0078
scott@fiddlerlaw.com
areed@fiddlerlaw.com

ATTORNEYS-IN-CHARGE
FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document will be automatically accomplished through notice of electronic filing, in accordance with the Federal Rules of Civil Procedure, on this the 10th day February 2012, to the following:

Mark R. Flora, Esq.
Ashlee Mann Ligarde, Esq.
Constangy, Brooks & Smith, LLP
98 San Jacinto Blvd., Suite 720
Austin, Texas 78701
aligarde@constangy.com

/s/ **G. SCOTT FIDDLER**

_____

G. SCOTT FIDDLER

-24-